Sam MILLER, Appellant,

v.

J. R. BLALOCK, M. D., Superintendent, Southwestern State Hospital, Marion, Virginia, Appellee.

No. 10079.

United States Court of Appeals Fourth Circuit.

Argued Jan. 7, 1966.

Decided Feb. 9, 1966.

Ronald P. Sokol, Charlottesville, Va. (Court-assigned counsel), for appellant.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellee.

Before SOBELOFF and J. SPENCER BELL, Circuit Judges, and BUTLER, District Judge.

J. SPENCER BELL, Circuit Judge:

This is an appeal from an order of the District Court for the Western District of Virginia denying without a plenary hearing the petitioner's application for a writ of habeas corpus.

The petition raises several issues, only one of which is pressed here: Is the petitioner, who has been confined in an institution for the criminally insane for more than seven years without an inquisition of lunacy or an adjudication of insanity, held in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States? The state concedes that he has been confined since 1958 under the provisions of section 19.1-228, Code of Virginia (1950) as amended, and that he has had neither an inquisition of lunacy nor an adjudication of insanity, but the state contends that he has a remedy under the state law by which he may ascertain his present mental condition and by which he may secure release if he is not now insane. Section 37-122 et sequi.

The record shows that the petitioner was arrested in Norfolk, Virginia, on April 7, 1958, having been indicted for murder and felonious assault. On April 8th he was sent to the Southwestern State Hospital at Marion, Virginia, under the provisions of section 19.1-228 of the Virginia law, " * * * in order for the court to determine whether such person is mentally competent to plead and stand trial * * *." On June 19, 1958, the superintendent of the hospital reported by letter to the judge of the Corporation Court of Norfolk that the petitioner was insane and, therefore, unable to stand trial. Two days after his confinement he filed a habeas petition which he was persuaded by the superintendent of the hospital to withdraw. Thereafter he filed a petition for habeas corpus in Smyth County, Virginia, the county in which the hospital is located. This petition raised several issues which are not relevant to this appeal. It also attacked the petitioner's commitment, alleging that he had never had a lunacy hearing or an adjudication of insanity. On July 29, 1963, the petition was denied. On June 11, 1964, the Supreme Court of Appeals of Virginia denied his petition for a writ of error and affirmed the judgment of the Circuit Court of Smyth County. A petition for certiorari was denied by the Supreme Court of the United States, 380 U.S. 981, 85 S.Ct. 1346, 14 L.Ed.2d 274, on April 26, 1965.

■■ We hold that the petitioner has exhausted his state remedies. It is true, as the state contends, that under the Virginia law, section 37-122 et sequi, the petitioner may by a writ of habeas corpus test whether he is presently insane, but this is not the issue which he has sought so diligently to present to the state court and to the court below. That issue is whether or not he was originally constitutionally confined. In Robinson v. Winstead, 189 Va. 100, 52 S.E.2d 118, Justice Eggleston, now Chief Justice, clearly pointed out the distinction and held that if one is committed under a void commitment he is entitled by writ of habeas corpus to test the validity of that commitment, and in such a proceeding it is not necessary to prove that he is now sane:

"The Attorney General argues that despite the invalidity of the commitment the petitioner is not entitled to his discharge, because, it is said, he has failed to allege and prove in the present habeas corpus proceeding that he is not in fact feeble-minded. In support of this argument he cites Code, § 1029, as amended by Acts 1920, ch. 164, p. 240.

"Under this statute [now section 37-122 et sequi] a person 'held in custody as insane, epileptic, feeble-minded or inebriate' may file a petition for a writ of habeas corpus with the proper court to determine his mental condition. Thus one previously adjudicated to be insane or feeble-minded is given the opportunity of showing that he is no longer mentally defective, and if he does so

his detention becomes illegal and he is entitled to his discharge.

"But it is not the purpose of the statute to require such a showing in order that one who is illegally restrained under a void commitment may be entitled to his discharge. In the present proceeding the mental condition of the petitioner is not in issue. We are concerned merely with the validity of the commitment under which he is held, that is, whether he has been deprived of his liberty in the manner prescribed by the statute." 52 S.E. 2d at 122.

Thus the state's contention before us that the petitioner has not suggested that he is now sane is irrelevant to this inquiry.

■ It is clear from the record that the petitioner has been confined for an indefinite period of time without the essential rights of notice and hearing, or opportunity to be heard before a competent tribunal. Simon v. Craft, 182 U.S. 427, 436, 21 S.Ct. 836, 45 L.Ed.

1165 (1901); State of Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940); Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). He has been confined without benefit of counsel or the use of expert testimony to test the validity of the report upon which his confinement was based. Cf. Gideon v. Wainwright, 372 U.S. 335, 342, and at pages 345–347, 83 S.Ct. 792, 9 L.Ed.2d 799, where Mr. Justice Douglas in a concurring opinion reviews the history of the broadening concept of fundamental fairness as applied to state procedures under the due process clause of the Fourteenth Amendment.

If we read section 19.1–228 [1] of the Code of Virginia to provide that a person may be confined in an institution for the criminally insane for an indefinite period of time without notice and without a hearing, as the state contends that we should read it, then we must hold that the statute is facially unconstitutional. If we read the section in connection with section 19.1–230.1 [2] to hold that upon re-

1. "§ 19.1–228. When question of sanity raised, commitment before trial.—If, prior to the time for trial of any person charged with crime, either the court or attorney for the Commonwealth has reason to believe that such person is in such mental condition that his confinement in a hospital for the insane or a colony for the feeble-minded is necessary for proper care and observation, the court or the judge thereof may, after hearing evidence on the subject, commit such person, if a white person, to any State hospital for the insane best adapted to meet the needs of the case and, if a colored person, to the Central State Hospital, under such limitations as it may order, pending the determination of his mental condition. In any such case the court, in its discretion, may appoint one or more physicians skilled in the diagnosis of insanity, or other qualified physicians, and when any person is alleged to be feeble-minded may likewise appoint persons skilled in the diagnosis of feeble-mindedness, not to exceed three, to examine the defendant before such commitment is ordered, make such investigation of the case as they may deem necessary and report to the court the condition of the defendant at the time of their examination. A

copy of the complaint or indictment, attested by the clerk, together with the report of the examining commission, including, as far as possible, a personal history, according to the form prescribed by the general board of directors of the State hospitals, shall be delivered with such person to the superintendent of the hospital to which he shall have been committed under the provisions of this section. As used in this section the term 'court' shall be construed to include courts not of record and courts of record."

2. "§ 19.1–230.1. Superintendent of institution to report finding that accused is insane or feeble-minded; commission to inquire into sanity or mentality.—If any such person so committed for observation prusuant to § 19.1–228 or 19.1–229 to the department for the criminal insane at the proper hospital is, in the opinion of the superintendent, insane or feeble-minded, the superintendent shall report such finding to the court from which such person was committed but shall retain custody of such person subject to the further order of the court. And upon receiving such report the court may appoint a commission or not to exceed three physicians, any or all of whom may be

ceiving a report from the superintendent of the institution that the petitioner is insane then it is incumbent upon the court to appoint a commission "who shall inquire into the facts as to the sanity or mentality of such person and report their findings to the court" as providing for notice and hearing before the person is committed for an indefinite period as distinguished from a temporary commitment for observation then we think that the petitioner is held in violation of his constitutional rights to proper notice and hearing.

Even though the confinement of an insane person under a void commitment is illegal, he will not be set at liberty under a writ of habeas corpus if his enlargement will be dangerous to himself or to other people, but he will be detained to permit a legal commitment to be secured under proper proceedings. Robinson v. Winstead, supra. We, therefore, remand the case to the district court with instructions to release the prisoner unless the state affords petitioner the hearing to which he is entitled within a reasonable time.

Reversed and remanded.

Alphonse LEWIS, Jr., Plaintiff-Appellee,

v.

CITY OF GRAND RAPIDS et al., Defendants-Appellants.

No. 15669.

United States Court of Appeals
Sixth Circuit.

Feb. 16, 1966.

from the staff of the hospital where the person is committed for observation, who shall inquire into the fact as to the sanity or mentality of such person and report their findings to the court."

Wendell A. Miles, Grand Rapids, Mich., for appellants, William J. Garlington, City Atty., Dutchess, Mika, Miles, Meyers & Snow, Grand Rapids, Mich., on brief.

George W. Crockett, Jr., Detroit, Mich., for appellee, Alphonse Lewis, Jr., Grand Rapids, Mich., Charles M. Waugh, James Kobza, Muskegon, Mich., on brief.

Before CECIL, O'SULLIVAN and EDWARDS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Appellants, City of Grand Rapids, Michigan, and its Chief of Police, William A. Johnson, challenge a judgment of the United States District Court which vacated an order of the Grand Rapids City Commission denying approval of the transfer of a Class C liquor license to plaintiff-appellee, Alphonse Lewis, and affirmatively ordered the Chief to recommend and the City to grant such ap-

proval. Under the Michigan Liquor Control Act, such approval was required before the Liquor Control Commission would effectuate the transfer. M.S.A. § 18.988, Comp.Laws Mich. 1948, § 436.-17. Roodvoets v. Anscer, 308 Mich. 360, 13 N.W.2d 850.

The District Judge held that the City Commission's action was the product of racial and other invidious discrimination and that plaintiff, a negro, was entitled to, and was denied, due process of law in the City's consideration of his application for such approval. After the desired approval was refused, and after a subsequent resolution of the Commission requesting the Liquor Control Commission to revoke the involved license, plaintiff brought this action in the United States District Court at Grand Rapids. His complaint charged deprivation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, and asserted jurisdiction under pertinent civil rights sections of the Judicial Code.

■ We hold that the District Judge erred in his conclusion that consideration of the transfer application had to comply with traditional procedures of due process, viz., specification of grounds for refusal, presentation of evidence supporting such grounds, confrontation of witnesses with opportunity for cross-examination, and like procedures.

■ If racial bias or invidious discrimination motivated the actions of the City of Grand Rapids, or if denial of the transfer approval was the consequence of a conspiracy to deny plaintiff Lewis his civil rights, then such actions must be struck down as a denial of the Fourteenth Amendment's guarantee to plaintiff Lewis of equal protection of the law. Glicker v. Michigan Liquor Control Commission, 160 F.2d 96 (CA 6, 1947). Our review of the entire record of the case, however, leaves us with "the definite and firm conviction that a mistake has been committed" by the District Court findings in such regard. United States v. United States Gypsum Co., 333 U.S.

364, 395, 68 S.Ct. 525, 92 L.Ed. 746, 766 (1948). Fed.R.Civ.P. 52(a). We reverse the judgment of the District Court to the extent that it vacates the order of the City Commission denying the transfer and affirmatively orders approval thereof. The City's brief does not challenge the District Judge's finding of denial of due process in the revocation of the license. We, therefore, do not discuss that. McCraw v. United Ass'n of Journeymen & App. of Plumbing, etc., 341 F.2d 705 (C.A. 6, 1965).

Much of the troubled history of Barnett's Bar, a Class C liquor establishment of Grand Rapids, is set forth in the extensive opinion of the District Judge. Lewis v. City of Grand Rapids, 222 F. Supp. 349–396 (W.D.Mich.1963). The opinion contains the District Judge's subjective conclusions and factual inferences upon which he based his findings. The Chief of Police and six of the seven members of the City Commission of Grand Rapids were convicted of conspiring to invidiously discriminate against plaintiff Lewis, motivated, at least in part, because he was a Negro.

Plaintiff Lewis' relevant connection with Barnett's Bar began in early 1959. Mr. Lewis, an attorney, had represented Patricia Barnett while she was under guardianship during her minority. Her property at that time consisted principally of her interest in the estate of her deceased father, the former licensee of Barnett's Bar, who had also been a client of Mr. Lewis. By marriage, Patricia Barnett became Patricia Ettress, and later Patricia Bell. The Liquor Control Commission did not consider this then 23 year old girl qualified to operate the bar and an initial step in Mr. Lewis' service to his young client was the making, on May 20, 1959, of a contract which made him the manager of Barnett's Bar. This arrangement was approved by the police authorities of Grand Rapids and was apparently required by the Liquor Control Commission as a condition to restoration of the license which had been suspended because of previous defaults. By this contract, plaintiff Lewis was to act as Mrs. Ettress' attorney as well as manager of her bar. He was given broad powers to sign all needed documents, and otherwise to exercise full control over the operation of the bar, including the right to hire and fire all of its employees. Lewis was to paid 6% of the bar's gross sales for the first year of his employment and 10% for the second and any subsequent term of the contract, with a guaranteed annual minimum compensation of $2,000.00. The contract further provided that Lewis was to be "the agent and attorney in fact" for his client. The record is unclear as to the amount of time Mr. Lewis spent at the bar in performance of his managerial duties. During the time of his management there were several defaults in payment of federal and state taxes, although it appears that Mr. Lewis cured at least one of such defaults with a loan from his own funds. One or more of such defaults brought about so-called "stop" orders to prevent the continued operation of the bar. During this period Lewis obtained a chattel mortgage on the bar equipment to secure advances made to Mrs. Ettress.

In August of 1960, as the consequence of a police investigation at the Barnett Bar premises, a complaint was filed with the Liquor Control Commission and with a Judge of the Police Court of Grand Rapids that the persons named therein were carrying on "the numbers game." Arrests of several persons were made. Mr. Lewis acted as attorney for those arrested and ultimately all charges were withdrawn or dismissed except as to one accused who pleaded guilty on October 2, 1961, to the unlawful possession of policy or pool tickets "at 58–60 Ionia Avenue, S.W."—the building where the bar was located.

On November 15, 1960, Patricia Ettress agreed to sell her license and business to one Dr. Cortez English for $18,000.00. In May of 1961, Lewis amended the English agreement to add himself as a purchaser with Dr. English. In April of 1961 Lewis had acquired a contract purchaser's interest in the building in which Barnett's Bar was located.

The sellers had acquired their title from Patricia Ettress' stepmother. The contract of purchase in which Lewis acquired an interest was in the names of his sisters. Following the making of the contract under which Mr. Lewis was to join in buying out his client, there began the steps to get the needed approval of a transfer of the license to plaintiff Lewis and Dr. English.

During 1961 and into 1962, Mrs. Ettress at various times expressed her dissatisfaction with Mr. Lewis' conduct and with his plan to acquire her license. On several occasions she wrote to the Liquor Control Commission, withdrawing her consent to a transfer. On May 10, 1961, she wrote to Lewis expressing her desire to terminate the management contract, stating "you are unable to take care of my affairs * * * because of conflicting interest." On October 21, 1961, following two and one-half years of Lewis' management of the bar, Mrs. Ettress reported to the Liquor Control Commission that her bar business was then under padlock for failure to satisfy Federal tax liens and that her license was then in the hands of the Internal Revenue Service; that her only out "now as before" was to sell her business to pay her debts. She asked that the pending application for transfer be withdrawn "because of some things that have happened since that application was sent in originally with only Dr. Cortez English as the buyer, before he requested that attorney Alphonse Lewis, Jr., be named as a partner." Her letter proceeds,

"He has been the manager of the before mentioned Barnett's Bar and also my attorney and financier on many occasions. I had repeatedly asked him for a final accounting and he gave it to me this summer after I was all ready committed to sell it to him. But, in a nut shell it goes as follows, for managers fees from May 21, 1959 to May 21, 1961, 6% of the gross income for the first year and 10% of the gross income for the second year. Which came to $8,406.78. I of course had never

been in business before and that was why the Commission requested that I have a manager at the time and also because I was only twenty-three at the time. Then also he wasn't what is refered to as a working manager because he is a attorney by profession law. So of course there were times when he didn't even come near the business few days at a time. He also billed me for miscellaneous legal fees which came to $2609.50. I felt that some of these came under management. In loans from him the amount comes to $6079.87, with 6% interest added in of course. The latter of which I'm more than willing to pay back to him and I have no doubt in my mind that I owe him for what I borrowed from him. The grand total of this is $17,096.15. The sale that I mentioned before was for only $18,000. As you can see this leaves me with the problem of paying my other obligations, which I couldn't pay for in a life time as I couldn't possibly earn enough on a job to pay them.

* * *

"I'm sending you a copy of a agreement that Mr. Lewis gave me to be considered and signed by me in lieu of a loan of $800.00 more to be paid by him to the Internal Revenue office to release the padlock. We had tried a situation similar to this and instead of his paying the tax he was in Lasing at some kind of a hearing with your Mr. Ressi to reconsider his application. He had however been in charge of the money because he had loaned me money to avoid closing for sales tax and I thought perhaps the whole business would be cleared up before this situation would have to be continued for long as it was not agreeable to me.

"He had however gotten money from the bar to pay these taxes to a degree that would have satisfied Mr. Farrell. Instead the bar was padlocked and that is how things stand at the present time. He paid some of the

obligations of the bar and kept the rest for his bill or against his bill I should say and he wouldn't even give me the money as I had none to live on because I had been home sick."

On December 19, 1961, Mrs. Ettress wrote the Commission "that the application for transfer of my license to Mr. Lewis and Mr. English is hereby cancelled."

Tax defaults were chronic during the upwards of three years of Mr. Lewis' management and it appears that for such entire period the personal property taxes due the City of Grand Rapids went unpaid. Additional circumstances preventing a license transfer were the long pending gambling charges. It was a policy of the Liquor Control Commission not to complete a transfer of a liquor license while violation charges remained outstanding. The long and confused route of the charges against the bar is set out in the District Judge's opinion, 222 F.Supp. at pages 353–355. From August, 1960, when some four or five men were arrested in a raid at the bar premises, until October 2, 1961, some charges remained pending. All of those charged were represented by Mr. Lewis. Two of those were dismissed on examination, two more had their cases nolle prossed, and one entered a plea of guilty to the possession of gambling paraphernalia "at 58–60 Ionia Avenue"—the address of the building where the bar was located. The District Judge found that this charge did not involve the bar itself, but we are unable to clearly understand how this conclusion was arrived at. Following the above dispositions, the Liquor Control Commission on October 31, 1961, concluded its own investigation of the gambling charges. Its report concluded that "there is no doubt * * * that there has been some gambling operations in your bar with the knowledge of your bartender." The examining officer dismissed the charges with the observation that he "was glad you're [Mrs. Ettress] going out of the business and I understand that you're [Lewis] going on * * *. I'm sure you'll [Lewis] be able

to curtail the activities." All of the foregoing, however, occurred during Lewis' management. He appeared, however, to cast the blame for any irregularities upon his client, Mrs. Ettress.

While the end of the gambling charges came, tax difficulties were continuing. Appellee Lewis recites transactions which eventuated in his acquiring his client's interest in the bar fixtures,

"In August of 1961 the sales tax man and the state police came to close her up, and after a half day conference they agreed if she turned over financial control of the bar to me, if I kept track of the money that came in from the bar and paid the sales taxes, that they would let her continue to operate, in addition also upon my paying $500 to them immediately and paying the sales tax weekly.

"Thereupon, this was communicated to Mr. Farell of the Internal Revenue, and at that time Mr. Farell had demanded that she come up with certain amounts of money. I had some money at that time and offered to pay it to Mr. Farell, if Mrs. Ettress would be sure that she didn't dissipate any more of the money. I could never get a firm agreement out of her, to my satisfaction, and so I did not pay Mr. Farell that particular money, and Mr. Farell was kept aware, of course, of the money as it was accumulated. Then he closed the bar, as indicated here before."

On November 13, 1961, the Internal Revenue agent sold the bar fixtures at auction and Lewis bought them in for $50.00. The $50.00 paid did not satisfy the Internal Revenue taxes and the bar remained closed from September 21, 1961, until April 6, 1962. Lewis asserts that by such purchase he acquired for himself his client's equity in the bar equipment over and above Lewis' chattel mortgage. He testified:

"Q. * * * You purchased certain property from the Internal Revenue

Service on auction sale on November 13, 1961, is that correct?

"A. Correct.

"Q. What price did you pay?

"A. $50.00. Now, that was also the second auction. The original auction went for $1,400.00 and the person couldn't pay for it. * * *.

"Q. What did you purchase on that auction?

"A. It was the equity * * * the equity of redemption of Mrs. Ettress over and above the chattel mortgage which I then held on all the bar equipment."

The complaint in this case alleges that the Internal Revenue Service "sold all the right, title and interest of Patricia Ettress at public sale * * * to *plaintiff* (Lewis)." We do not find that Lewis has ever announced or considered that the title he then acquired was to protect or as trustee for his client. In December, 1961, Patricia Ettress wrote to the Liquor Control Commission that she considered the application for transfer to Lewis and Dr. English void. On December 14, 1961, she made a sworn statement to a Grand Rapids Police Lieutenant that she would not go through with a sale to Lewis and English, saying, "I don't want to transfer it to them simply for credit for Mr. Lewis' bills." The confusion existing in these months is set forth in the District Judge's opinion at 222 F.Supp. 356–358.

Mrs. Ettress' recalcitrance was met by a lawsuit filed on December 21, 1961, in the State Circuit Court at Grand Rapids, whereby Mr. Lewis sought to specifically enforce the agreement that his client had made with Dr. English and to which he had become a party. His complaint asked that he be appointed receiver of Barnett's Bar. This was refused. Lewis' application for transfer continued undetermined into 1962. The Safety Committee of the Grand Rapids City Commission which was considering the request for transfer to Lewis and Dr. English, undertook to study Lewis' lawsuit against his client, the transferor. On March 20,

1962, an agreement settling the lawsuit was entered into. By it, Lewis and Dr. English agreed that in addition to the $18,000 originally agreed upon they would assume and pay an additional $7,300 of Mrs. Ettress' debts. This agreement was subject to approval of the transfer of the license. See appendix to the District Court opinion at 222 F.Supp. 391.

The agreement of November 15, 1960, with Dr. English, was drafted and concluded in Lewis' office. There is nothing in the evidence to indicate that Dr. English was otherwise than Lewis' client. The sale price of $18,000 was originally to be paid in cash. It was not then geared to what Lewis' client then owed, or would owe to him for advances and services. It was after Lewis was added as a purchaser that he rendered a statement to his client totalling slightly more than $17,000. This amount was made up of loans at 6% interest amounting to about $6,000, and Lewis' fees as manager and attorney in the amount of about $11,000. With the addition of $1,920 that Mrs. Ettress owed to Dr. English, the arrangement would leave her still owing a balance to Lewis and Dr. English. There is no evidence that in the making of this deal Mrs. Ettress had any other advisor than her attorney and manager, Mr. Lewis. In May, 1961, the price was $18,000. When she was sued for performance of that agreement by her own lawyer, Mrs. Ettress obtained new counsel. When this litigation was presumably settled in March of 1962, about $7,300 was added to the purchase price by way of assuming additional debts of Mrs. Ettress.

Among faults charged to the City Commission by the District Judge was failure to detail to Lewis its reasons for not approving him. He found as a fact that the Commission had not, prior to the revocation proceedings, made specification to Lewis of the reasons which prompted its actions. It does appear that no formal enumeration of the reasons for denial was provided. But, whether formally notified or not, during consideration of the transfer Lewis was aware of the things

which, at the trial of this case, were identified as the causes of his being disapproved. He knew about the tax defaults and the closing of the bar therefor. He testified that he told the Safety Committee that the taxes would be paid if he was approved as a transferee. This conditional promise was not a substitute for discharge of an obligation assumed when he was given the exclusive financial control of the business. Placing the blame on his client was not an answer; neither was his intimation that his client and a boy friend were taking large sums of money from the enterprise. He knew about the gambling charges. He was the lawyer for all persons involved. He knew about his own relations with his young client, to whom he stood in a position of high trust. He knew that this fiduciary relationship ended in his suit to require her to convey to him the asset which he had been managing for upwards of two years. He knew of her complaints about his management and her "on again, off again" attitude toward transferring her license to him. The Grand Rapids authorities learned of these things in the course of their numerous hearings on the transfer application.

Members of the City Commission testified that the City Attorney had advised them that it was not necessary to specify to applicants reasons for denying a transfer, that embarrassment of such applicants was thus avoided. It seems clear that during the Safety Committee hearings the standing of Mr. Lewis as an acceptable transferee of the license for Barnett's Bar was deteriorating. We are of the view that considering the discretion vested in a City Commission in the matter of transfers of liquor licenses, the City Commission had ample ground for finding Mr. Lewis unacceptable.

Applications for transfer of liquor licenses are first referred for consideration and recommendation to a Safety Committee made up of three members of the Grand Rapids City Commission. The latter is the elected governing body of the city and consists of seven members who serve part time, meeting regularly once a week. The Chief of Police submits a Liquor Control Commission form (LCC 1800) giving his recommendation as to transfers. This is considered, but not necessarily controlling. It had not been the practice of the Safety Committee to hold formal hearings, with the taking of testimony and like procedures.

Hearings of the Safety Committee to consider Lewis' application extended over a period from January 16, 1962, to July 31, 1962, at which latter date his application was denied. At the January 16 hearing, Lewis was present and spoke for himself and Dr. English. The matter was then tabled to allow Commissioner Sevensma, a lawyer, to review plaintiff Lewis' then pending suit against his client in the Circuit Court of Kent County, Michigan. Through this investigation, the Safety Committee learned of the character and issues involved in the litigation between Lewis and his erstwhile client, and then unwilling transferor. The above-detailed settlement of the lawsuit was made on March 20, 1962, and was conditioned upon approval of a license transfer to Dr. English and plaintiff Lewis.

On April 17, 1962, the Safety Committee again took up the matter. Lewis was present. At this meeting, the Grand Rapids Chief of Police, William A. Johnson, presented a letter dated April 12, 1962, from the United States Internal Revenue Service requesting that a "Stop Order" be placed against a transfer of the license to Lewis. This letter was signed by revenue agent Gordon F. Forell.[1] An earlier letter, dated April 6,

1. The letter, addressed to the "Superintendent of Police," read:
    "It has been brought to the attention of this office that Mr. Alphonse Lewis, Jr., Attorney at Law, Grand Rapids, Michigan, has applied for the transfer of the Liquor License held by Patricia Ettress, DBA Barnett Bar, 60 Ionia Ave. S.W., Grand Rapids, Michigan.
    "For your information, Patricia Ettress is indebted to the Federal Government for past due Federal taxes for which

1962, had been written by the Liquor Control Commission expressing the Commission's understanding that "This has been a complex matter which we hope has now been satisfactorily clarified. We understand the violations and tax difficulties have all been resolved." The Safety Committee's desire to have reconciled this apparent conflict between the Liquor Control Commission's April 6 statement that tax difficulties had been settled and the Internal Revenue letter requesting a "Stop Order" for failure to pay federal taxes is emphasized by the District Judge as indicative of bad faith in the Safety Committee's delay in approving the transfer. Lewis contends, and the District Judge agrees, that the Chief of Police solicited the Internal Revenue letter as a means of thwarting Lewis. The Chief's denial of soliciting the letter and his attempt to explain its origin was cut off by the sustaining of a Lewis objection.[2] The charge of solicitation finds its principal support in plaintiff Lewis' hearsay statement that he had heard that such was the case. In all events, we find no impropriety in the Chief's presentation of the letter, especially in view of the chronic tax delinquencies of the bar under Lewis' management. Whether solicited or not, the factual correctness of the Farell letter is not questioned, viz.: that notices of federal tax liens had been recorded; that a "Stop Order" on the transfer *had been placed* with the Liquor Control Commission; and that the Internal Revenue Service desired similar action by the City of Grand Rapids. The record does indicate that Chief Johnson was developing a view that Lewis was not a desirable licensee for this bar. In addition to the tax de-

linquencies, the Chief considered that the charged operation of the numbers game at the bar, and Lewis' conduct in handling his client's affairs, lessened his attractiveness as a licensee.

Between the April 17 and the July 24, 1962 meetings, investigation by the Liquor Control Commission continued; the agent in charge reported difficulty in contacting Lewis, and Lewis then indicated that he was not in a hurry to have the investigation concluded. On July 24, 1962, a hearing was held before the Safety Committee with Lewis, Dr. English, Mrs. Ettress, and her then attorney present. Mrs. Ettress was then agreeable to a transfer to Lewis and Dr. English. There is dispute as to what was said and done at the meeting, but seemingly all present had an opportunity to express themselves. This meeting concluded with a carried motion that the matter be tabled for three weeks. At the trial of this case, Lewis and the city officials expressed differing understandings of the import of tabling the matter. Lewis stated that he assumed a further hearing would be held in three weeks. Safety Committee members considered that the hearing was concluded and that the tabling was merely for the purpose of allowing the Committee to consider its decision, and to obtain some further information from the Liquor Control Commission.

In all events, at the next regular meeting of the Safety Committee, July 31, 1962, the matter was taken from the table by unanimous vote, and denial of the transfer recommended. Lewis was not present nor given notice that such meeting was to consider his application. The reason given for acting without waiting

---

Notices of Lien have been filed with the Register of Deeds, Kent County, Michigan.